**In re Christopher Thomas CAMERON, Jennifer Denise Cameron, Debtors.**

**No. 4:10–bk–14987.**

United States Bankruptcy Court, E.D. Arkansas, Little Rock Division.

May 17, 2011.

756

Kendel William Grooms, Almand, Orsi & Campbell, PLLC, Little Rock, AR, for Debtors.

## ORDER

JAMES G. MIXON, Bankruptcy Judge.

On July 13, 2010, Christopher and Jennifer Cameron (Debtors) filed a voluntary petition for relief under the provisions of Chapter 13 of the United States Bankruptcy Code. On August 19, 2010, Lakeview Land Company, LLC d/b/a Saville Homes

(Lakeview) filed a proof of claim in the amount of $111,104.47. Attached to the proof of claim is an itemization of the claim that consists of a $20,000.00 oversight fee, $45,893.47 for outstanding costs with material and labor, and $45,211.00 in attorneys' fees. (Debtor's Ex. 6.) The Debtors objected to the proof of claim on August 26, 2010.

A hearing was held on December 2, 2010, and the objection to the proof of claim was taken under advisement.[1] Both parties filed briefs in the matter. The Court has jurisdiction pursuant to 28 U.S.C. § 157 and § 1334. The pending matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter a final judgment in the matter.

## I.

## FACTS

The Debtors and Les Saville (Saville) were family friends. Lakeview is a company that was formed by Saville and his wife in 2004 for the purpose of acquiring and developing properties. (Tr. at 28.) Neither Lakeview nor Saville is a licensed contractor. (Tr. at 30.)

Saville became aware that the Debtors wanted to build a house and offered to help them build it. Saville drafted a writing to reflect their agreement that Saville, through his company Lakeview, would oversee the construction of a house to be built in Sherwood, Arkansas for the benefit of the Debtors. On November 28, 2005, this agreement was signed by both parties. (Tr. at 411.) It does not contain any purchase price. (Tr. at 13.) The writing states that:

[1] On September 13, 2010, the Creditor objected to the Debtors claim of exemption of a hunting cabin. This matter was set for the same hearing but was deferred until the objection to claim was resolved. Subsequently, the Debtors' interest in the cabin was sold over the objections of Saville.

[Lakeview] will obtain interim construction financing.... The total fee from [Lakeview] to the [Debtors] for performing the necessary duties to oversee the construction of the property/home will be twenty thousand dollars ($20,000.00). [The Debtors] agree to be responsible for any additional cost incurred for work or materials that are in addition to the specifications listed in Schedule A.

(Debtors' Ex. 1.) Schedule A is a list of specifications with no prices attached.

Saville stated they had an oral agreement and, "[t]he agreement was the cost of the home would be paid by the Camerons. The total cost to build the home." (Tr. at 77–78.) Saville again stated, "[t]hat the house would be built per the specifications, and that what it cost, it is what it is, and my fee is fixed at 20,000.00 dollars." (Tr. at 447.) The Debtors claimed they had set a budget of $250,000.00 and Saville knew about this budget and agreed to it. (Tr. at 215 & 455.) Saville denied that there was ever a budget of $250,000.00. (Tr. at 167, 443 & 536.)

Lakeview purchased the lot for the home and then obtained a construction loan. (Tr. at 33.) Saville could not explain if Lakeview purchased the lot with separate funds or if it was part of the construction loan. (Tr. at 123–127.) The lot cost around $38,000.00. (Tr. at 557.) Mr. Cameron was added as a co-borrower on the construction loan on February 20, 2006. (Tr. at 33–34.) The construction loan was for $218,00.00. (Debtor's Ex. 34.)

As soon as February 2006, the Debtors became aware that the total cost was going to be more than $250,000.00. (Tr. at 337.) The Debtors were concerned about the costs of the construction. Saville waived his fee of $20,000.00 to ease their concerns. (Tr. at 39, 42, & 166.) According to the Debtors, they worked to keep the costs down throughout the construction process cutting items back or completely taking items off the spec sheet and then adding items back when Saville told them that they were under budget. (Tr. at 219–224.) Saville disputes this assertion, stating that he never had a clue what the final costs would be until all invoices were in; however, he also testified that before closing, which was before all the invoices were in, he told the Debtors they would have to pay an additional $48,000.00 and some change. (Tr. at 509 & 554.)

In early August of 2006, Mr. Cameron stated that he began looking for a house elsewhere because "the deal had gotten worse" and he "asked to get off the construction loan," but Saville refused to let him out of the loan. (Tr. at 669.) Saville stated that he and Mr. Cameron agreed that when all of the final invoices came in, they would sit down and would mutually agree to the terms and "work it out." (Tr. at 64.) Mr. Cameron also stated that they were going "to work something out when the numbers were hard and solid and real." (Tr. at 200.) This agreement was never reduced to a writing. (Tr. at 55.) Mr. Cameron stated that because of representations made by Saville, he believed they were over budget by around $15,000.00 to $20,000.00. (Tr. at 204, 235, 669, & 674.)

On August 22, 2006, Saville and Mr. Cameron signed a standard offer and acceptance contract with a purchase price of $250,000.00.[2] (Debtor's Ex. 7.) At the time the offer and acceptance was signed, both parties were aware that the total cost was going to be more than $250,000.00. (Tr. at 188 & 202.) It is undisputed that both parties signed the agreement so that they could close the long term loan on the

2. Mrs. Cameron did not sign this agreement.

home. It is also undisputed that the parties agreed that Saville stated that he would finance any amount due over the $250,000.00. (Tr. at 509 & 672.) Saville signed an owner's affidavit stating that "all claims, liens and charges against said premises for material and labor thereon are paid in full." (Debtor's Ex. 9.) Saville also signed a builder's or contractor's affidavit stating that "all charges and costs for labor performed, material furnished and fixtures installed on said premises are free and clear of all lienable claims." (Debtor's Ex. 10.) Both of these affidavits were signed "to induce Chicago Title Insurance Company to issue its title insurance." (Debtor's Ex. 9 & 10.)

Given the amount of outstanding bills still due at closing, Saville's repeated testimony that he wasn't aware that there were more bills to be paid at the time of closing is simply not credible. (Debtor's Ex. 12.) The Debtors moved into their new home just prior to closing and the parties closed on August 31, 2006. (Debtor's Ex. 8; Tr. at 11, 14, 82, & 283.) The $210,000.00 construction loan was paid off and Lakeview received a check from the bank for the remaining balance of the permanent loan in the amount of $32,000.00. (Tr. at 544.) Saville continued to write checks after the closing for bills due on the house. (Tr. at 95–97.)

For about a year after closing, the parties tried to reach an agreement. (Tr. at 70–71.) When Saville asked for more than $45,000.00 over $250,000.00, "[i]t caused some issues, big time." (Tr. at 675.) The Debtors received a bill for $45,893.47 from Lakeview and the Debtors refused to pay it. (Debtor's Ex. 2 & Tr. at 15.) The $45,893.47 is the alleged amount of outstanding costs still due on the construction project after closing. (Tr. at 66.)

Mr. Cameron alleges that the reason they were around $45,000.00 over budget was mismanagement on Saville's part. (Tr. at 331 & 685.) Mr. Cameron disputes several of the invoices, including being charged closing costs on the lot loans, interest paid on the lot loans, builder's risk insurance, and being charged to fix items that should never have happened in the first place that total $32,650.41. (Debtor's Ex. 22.) The Debtors vehemently objected to Dennis Rhodes' $15,000.00 fee as the general contractor, alleging that he was never at the construction site. According to Saville, when it became clear that an agreement was not going to be reached Saville believed his $20,000.00 waiver was no longer applicable. (Tr. at 65.)

Lakeview sued the Debtors in state court. On a motion for summary judgment, the Pulaski County Circuit Court found the November 2005 writing "violates the statute of frauds in that it fails to contain essential terms, such as the contract price, and fails to reflect a meeting of the minds concerning the cost of the items added to the construction contract." (Debtor's Ex. 3.) This order was not appealed. (Tr. at 79.) The parties were set to go to trial in state court on the remaining issues when the Debtors filed for bankruptcy. On August 19, 2010, Lakeview filed a claim in the amount of $111,104.47. (Debtor's Ex. 6.)

## II.

### ARGUMENT

The Debtors argue Lakeview's claim should be disallowed because the Bankruptcy Code does not allow claims based on an unenforceable agreement. They argue that the November 2005 writing is not enforceable because essential elements are missing from the agreement. The Debtors argue if any agreement is enforceable, it is the offer and acceptance in the sum of $250,000.00. The Debtors argue they do

not owe any additional sums to Saville because of the doctrine of merger and because Saville signed affidavits stating that nothing more is owed. The Debtors further argue that Saville waived his $20,000.00 oversight fee and that the Debtors relied on this waiver. Finally, the Debtors state that under Arkansas law they are entitled to attorneys' fees in the amount of $62,964.58.

Lakeview argues the initial contract was for the cost of building the home plus a $20,000.00 fee and that this is the controlling contract that is valid under Arkansas law. According to Lakeview the state court order did not comply with rule 54(b), and, therefore, it is not a final order and this Court is not bound by the state court's determination that the initial written agreement is invalid. Lakeview also argues that by failing to complete this contract, the Debtors rejected Saville's offer to waive his $20,000.00 fee. Lakeview argues the offer and acceptance is not binding because there was no mutual assent, nor was it signed by all parties. Lakeview further argues that if the Court finds the November 2005 agreement fails then they should recover under the theory of quasi contract. Lakeview argues that the attorneys' fees are due pursuant to Arkansas law that allows for attorneys' fees in a breach of contract claim.

## III.

## DISCUSSION

■ A properly filed proof of claim constitutes prima facie evidence of the validity and amount of the claim. Bankruptcy Rule 3001(f) & 11 U.S.C. § 502. The objecting party then assumes the burden of producing evidence rebutting the claim. *In re Pettingill*, 403 B.R. 624, 627 (Bankr. E.D.Ark.2009) (citations omitted). After evidence is presented rebutting the claim, the claimant must then produce additional evidence proving the validity of the claim by a preponderance. *In re Gran*, 108 B.R. 668, 674 (Bankr.E.D.Ark.1989) (citations omitted).

A claim is not allowed to the extent that a claim is unenforceable against a debtor and a debtor's property "under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). Therefore, Arkansas law must be examined to determine if there is an enforceable contract.

■ The following are the essential elements of a contract: (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligations. *Jordan v. Diamond Equip. & Supply Co.*, 362 Ark. 142, 152–153, 207 S.W.3d 525, 533 (2005)(citing *Tyson Foods, Inc. v. Archer*, 356 Ark. 136, 142, 147 S.W.3d 681, 684 (2004)). There must be a meeting of the minds as to the essential elements to have a binding contract. *Malco Theaters, Inc. v. Boswell*, 211 Ark. 143, 147–148, 199 S.W.2d 606, 609 (1947); see also *Quaker Oats Co. v. Brinkley Dryer & Storage Co.*, 164 F.Supp. 761, 769 (E.D.Ark.1958). That is, all terms should be definitely agreed upon. *Ciba–Geigy Corp. v. Alter*, 309 Ark. 426, 445, 834 S.W.2d 136, 145 (1992).

■ Contracts affecting an interest in real property must be in writing to be enforceable. Ark.Code Ann. § 4–59–101(a)(4). "A contract for the sale of land which fails to show the terms and conditions of the sale, the price to be paid, and the time for payment is not sufficient to satisfy the requirements of the statute of frauds." *VanDyke v. Glover*, 326 Ark. 736, 743, 934 S.W.2d 204, 208 (1996). However, partial or full payment of consideration together with taking possession by the purchaser is sufficient to remove an oral contract from the statute of frauds. *Chad-*

*well v. E.T. Pannell,* 27 Ark.App. 59, 63, 766 S.W.2d 38, 40 (1989).

■ Agreements that allow for future agreements are generally void because there is no meeting of the minds to create a valid contract. *Development & Construction Management, Inc. v. City of North Little Rock,* 83 Ark.App. 165, 172–173, 119 S.W.3d 77, 82 (2003). If an uncertainty or ambiguity exists within the terms of the contract then courts must construe the contract most strongly against the party who drafted it. *Elcare, Inc. v. Gocio,* 267 Ark. 605, 608, 593 S.W.2d 159, 161 (1980).

■ A quasi contract is a legal fiction that the law can imply to do justice so that one person is not unjustly enriched at the expense of another; it is restitutionary in nature. *Dews v. Halliburton Inc.,* 288 Ark. 532, 536–537, 708 S.W.2d 67, 69 (1986).

■ Attorneys' fees can be awarded to the prevailing party in a civil action to recover on a contract. The relevant code provision provides:

> In any civil action to recover on an account stated, promissory note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, or for labor or services, or breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs.

Ark.Code Ann. § 16–22–308. A court's award of attorneys' fees pursuant to this statute is permissive and discretionary. *Logue v. Seven–Hot Springs Corp.,* 926 F.2d 722, 725 (8th Cir.1991).

## IV.

## ANALYSIS

The Court will first analyze each of the writings to see if there is a valid written contract. The oral agreement between the parties will then be analyzed. Finally, the Court will discuss whether attorneys' fees are appropriate in this matter.

### A. The Written Agreements

■ It is clear from the evidence that neither the November 2005 writing that contained no price nor the August 2006 offer and acceptance that contained the purchase price of $250,000.00 are valid contracts. Regarding the November 2005 writing, this writing contains no purchase price or any way to determine the purchase price. There is simply no way to look at this writing and determine what the parties intended, and, therefore, it is an invalid contract.[3]

The August 2006 offer and acceptance for $250,000.00 represented neither parties' understanding of the agreement at the time is was executed; it was simply created to facilitate the closing of the long term loan. At the time of signing this offer and acceptance, the Debtors believed the total cost was going to be $15,000.00 to $20,000.00 more than $250,000.00. Saville testified that he had no idea how much the total cost of the house was going to be when the offer and acceptance was signed. Neither party believed at the time of execution that $250,000.00 was going to be the total purchase price, as represented by the writing. However, each parties' idea of how much more than $250,000.00 the total purchase price was going to be was significantly different. At most, the parties agreed to work it out in the future, but

---

**3.** Judge Gray also found that the first agreement was unenforceable. The parties argue whether or not her finding on a motion for summary judgment is binding. This is an issue that is not necessary to address because the parties tried the issue of enforceability and this Court also finds the agreement is unenforceable.

each party had a very different idea of what they were even agreeing to work out in the future. The Debtors believed they were agreeing to pay $15,000.00 to $20,000.00 over the $250,000.00 so long as the charges were reasonable. Saville believed the Debtors were agreeing to pay whatever the costs were regardless of how much more than $250,000.00 the total cost ended up being, as long as the charges were reasonable. There was no meeting of the minds regarding the offer and acceptance and the writing is not a valid contract.

### B. The Oral Agreement

Although neither writing is a valid contract, it is undisputed that the house was built and the Debtors moved into the house. These acts take an agreement out of the statute of frauds. At the initial stages of negotiations, the Debtors explained to Saville that they could only afford a $250,000.00 house. At the time of the November 2005 writing, the Debtors stated the agreement was for Saville to build them a home with a budget of $250,000.00. The Court finds this testimony credible and that this was the oral agreement the parties made in November 2005. Saville's waiver of his $20,000.00 fee to help ease their concerns lends further support to the fact that there was an agreed upon budget. The fact that the offer and acceptance was for the amount of $250,000.00 also supports the finding that there was initially a $250,000.00 budget. Saville's testimony that the agreement was for whatever the cost came to is simply not credible. Furthermore, Saville was the party that drew up the November 2005 agreement and he was the party who regularly engages in this kind of work and should be aware of the necessity for a valid contract. Accordingly, the Court con-

strues the writing against Saville and finds in favor of the Debtors. Saville had the burden to prove the validity of his claim by a preponderance. Saville did not meet his burden.

The Court finds that there was an oral agreement for the building of a home for a total of $250,000.00. The Debtors have paid off the construction loan in the amount of $218,000.00 and $32,000.00 to Lakeview, for a total of $250,000.00; therefore, they have paid Saville in full what is due.[4]

### C. Attorneys' Fees

The Debtors and Saville have each asked for attorneys' fees pursuant to Arkansas Code Annotated § 16–22–308. The Debtors are the prevailing party, and, therefore, the only party that could be awarded attorneys' fees pursuant to this statute; however, given the facts it is not appropriate to award the Debtors any attorneys' fees. Both parties signed the initial contract and both parties are responsible for an incoherent agreement with no agreed upon purchase price written into the contract. This litigation was bound to happen as a result of the failure to enter into a valid written contract with all the essential terms. The Debtors simply could and should have done more to protect themselves. Accordingly, attorneys' fees are not appropriate.

### V.

### CONCLUSION

The objection to the proof of claim is sustained and the claim is disallowed.

**IT IS SO ORDERED.**

---

4. The Court does not find that this unjustly enriches the Debtors; therefore, quasi contract is not appropriate. The Debtors argued

the doctrine of merger; however, because the Debtors are prevailing on other grounds, it is not necessary to discuss it.